# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

STACEY LEWIS GROVE,

                    Petitioner,

    v.

TEREMA CARLIN,

                    Respondent.

Case No. 3:17-cv-00306-CWD

**MEMORANDUM DECISION
AND ORDER**

Petitioner Stacey Lewis Grove filed a Petition for Writ of Habeas Corpus challenging his state court conviction. (Dkt. 1.) Respondent Terema Carlin filed an Answer and Brief in Support of Dismissal (Dkt. 16), and Petitioner filed a Reply. (Dkt. 36.) All named parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. (Dkt. 10.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

The Court takes judicial notice of the record from Petitioner's state court proceedings, lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006). Having carefully reviewed the record and considered the arguments of the parties, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying the Petition and dismissing it with prejudice.

**MEMORANDUM DECISION AND ORDER - 1**

# BACKGROUND

On January 26, 2007, in the Second Judicial District Court in Nez Perce County, Idaho, Petitioner was charged with first-degree murder under Idaho Code §§ 18-4004, 18-4002, and 18-4003. The indictment alleged that Petitioner caused the death of 23-month-old K.M. during an aggravated battery by striking him in the head, which caused brain injury, and in the stomach, which caused abdominal bleeding and musculature hemorrhaging. (State's Lodging A-1, pp.13-14.) Petitioner proceeded to trial, where a jury convicted him of first degree felony murder, finding him guilty beyond a reasonable doubt. (State's Lodging A-2, p. 252.)

K.M. was the son of Lisa Nash ("Lisa") and Todd Martin ("Todd"). Lisa and Todd were never married, and  Lisa left the relationship when K.M. was about one year old. Lisa said that Todd had repeatedly physically abused her, but he had never physically abused K.M. (State's Lodging A-3, p. 712-17.)

After her departure, Lisa and Todd engaged in a custody battle over K.M. Lisa was unsuccessful in keeping Todd from having extended visitation with K.M. In approximately April 2006, Todd was granted overnight visitation with K.M. (*Id.*)

Also in 2006, Lisa and Petitioner became romantically involved. Petitioner moved into the Lewiston mobile home Lisa shared with K.M. and her daughter, K.B., who was about nine years old.[1] At the time of K.M.'s death, Petitioner was unemployed. He had a

---

[1] An interesting side note is that, before Lisa's relationship with Todd, Lisa and K.B.'s biological father lived together, and the father was charged with abusing K.B. when she was an infant, arising from health care workers' discovery that the three-month-old had a broken clavicle. Child Protective Services removed K.B. from Lisa's home for about one year, with one of the stipulations for return of her daughter

**MEMORANDUM DECISION AND ORDER - 2**

ten-year-old son from a previous relationship with whom he did not have contact and for whom he did not pay child support (State's Lodging A-4, pp. 1074, 1115.) At the time, Lisa was working at the Valley Boys and Girls Club. Lisa's daughter attended the Boys and Girls Club with her mom. Andrea Williams was K.M.'s regular babysitter, but Petitioner sometimes babysat K.M. while Lisa and K.B. were at the Boys and Girls Club. (State's Lodging A-3, pp. 719-27, 783.)

At trial, Lisa testified that K.M. had been lethargic on and off for about seven to eight weeks prior to his death. Instead of being his normal, happy, energetic self, K.M. began to have "really lethargic, down-in-the-dumps, puny days." (State's Lodging A-4, p. 726.) During the seven to eight weeks when K.M. was not acting like himself, Lisa and her mother had taken K.M. to his regular pediatrician's office several times, including on May 31, June 13, June 20, and July 6, 2006. (State's Lodging A-3, p. 82.) K.M. usually saw Dr. Gregory Schultz, but on occasion saw another pediatrician, including Dr. Ambroson.

At one of the appointments, K.M. was diagnosed with swimmer's ear and was given a prescription medication as a remedy. At another of K.M.'s appointments, the doctor diagnosed a balding patch of hair on the back of K.M.'s head as stress-induced alopecia. During that seven-to-eight-week time frame, Lisa returned to work full-time,

---

being that she cease living with K.B's father, which she did. Lisa also admitted that she had punched K.B.'s father in the arm once and had been arrested for domestic battery, as a result. The charges were later dismissed. After Lisa's relationship with K.B.'s father ended, she met and lived with Todd (during which time she had K.M.), and then met and lived with Petitioner. (See State's Lodging A-3, pp. 76-95.)

**MEMORANDUM DECISION AND ORDER - 3**

K.M. began overnight visitation with Todd, and Petitioner was babysitting K.M. while Lisa worked. (State's Lodging A-4, p. 719.)

On July 6, Lisa's mother picked up a lethargic K.M. from Petitioner's care and took him to the pediatrician's office. Dr. Ambroson examined K.M. "for a nonspecific illness, probably a respiratory infection." (State's Lodging A-4, p. 1139.) Dr. Schultz testified at trial that, according to the law and their unwritten protocol, if Dr. Ambroson had seen any signs of child abuse, he would have reported it to Dr. Schultz, as the child's primary pediatrician, as well as to Child Protective Services. (*Id*., pp. 1140-41.)

On July 7, 2006, Todd's wife picked up K.M. for an overnight visit. On July 8, at 4:10 p.m., Todd and his wife took K.M. to the emergency room. Dr. Donald Chin, the emergency room doctor, recalled that Todd and his wife initially were worried about a little sore on K.M.'s nose (impetigo), but also had concerns about a couple of bruises, one on the mandible (Lisa had told Todd it was from a fall in the bathtub), and one in the axilla area below the armpit. Todd and his wife were concerned about possible child abuse and wanted Dr. Chin to call a child protective agency. (*Id*., p. 850.)

Dr. Chin photographed the bruises and performed a thorough examination of the child, including an examination of the head, throat, neck, abdomen, and extremities, and found no suspected abuse, other than the bruises. Dr. Chin found the abdomen to be "totally soft" and observed no "guarding, which is a serious sign indicating internal pain for which Dr. Chin would have recommended a CAT scan. Dr. Chin deemed the results of the abdomen examination "pretty benign." (*Id*., p. 849.) Further, K.M.'s retinal and ophthalmic examinations were normal, and his neurologic workup showed no evidence

**MEMORANDUM DECISION AND ORDER - 4**

of neurologic abnormalities. (*Id*.) Dr. Chin testified: "There is no way that we would have missed any of these injuries. This is—what I read on the autopsy report is the most brutal case I've – I've ever seen." (*Id*., p. 851.)

At Todd's insistence, the hospital called Child Protective Services, and a case worker came to the hospital, met with Todd and his wife, and then released the child to them. (*Id*., p. 850.) Dr. Chin prescribed a medication for the impetigo and entered a discharge order. K.M. was released from the hospital at 7:10 p.m. on July 8 (three hours after his arrival). Todd returned K.M. to Lisa about 2:45 p.m. on July 9, less than 24 hours before he was rushed to the emergency room unconscious. (*Id*., pp. 847-51.)

Lisa and Petitioner testified differently at trial about two prior incidents from which the jury may have inferred that Petitioner had abused K.M. while babysitting. Lisa testified that, on an unspecified date before July 7,[2] Petitioner approached her as soon as she had come home from work and told her that K.M. had slipped in the bathtub and bruised his chin. She thought nothing of it at the time. (*Id*., p. 796.)

However, Lisa testified that, each time Petitioner told the story to hospital personnel, he told them that *she* had been present when the injury happened, even though she had been at work. She did not correct him and even adopted that version as her own, telling a detective that she had been present, even though it was not true. But at trial, she said she wanted to "come clean about that," because she did not consider herself "a liar."

---

[2] July 7 was the day Todd took K.M. to the emergency room for suspected child abuse.

**MEMORANDUM DECISION AND ORDER - 5**

(*Id*., p. 796.) She explained: "It was just very easy to go along with what [Petitioner] said at the hospital because it was "just a big cloudy ..., you know, not reality." (*Id*.)

Petitioner testified at trial that he had nothing to do with the bathtub incident, but saw K.M.'s bruised chin for the first time on Sunday, July 10, when K.M. returned from Todd's home. Petitioner testified that Lisa had explained that K.M. had slipped and bruised his chin when she was bathing him. Petitioner testified that he had last seen K.M. on the previous Thursday, and he had not noticed the bruise then (State's Lodging A-4, pp. 1103-04.) However, in Petitioner's investigative interview with Officer Greene, which was played for the jury, Petitioner talked as though he had been present when the chin injury occurred.[3] On direct examination, Petitioner clarified that he had not been present, and he was just explaining to Officer Greene what he had been told by Lisa, and that she, alone, had been present when K.M. injured his chin. (*Id*., p. 1104-05.)

Lisa testified that, one day when she was preparing dinner, Petitioner told her that K.M. "had been kind of down all day." (*Id*., p. 727.) That prompted Lisa to call her mother, who is a nurse. Lisa's mother told her to take K.M. to the doctor again if she felt the need to do so. Lisa described Petitioner as getting very upset and telling her that, if she took K.M. to the doctor again, he was going to leave her. She decided to take K.M. to the doctor anyway, and Petitioner got in his car and drove away. Later Petitioner called Lisa to apologize and wanted to know if he could come back. (*Id*.)

---

[3] The recording is not a part of the record before this Court. This information was described in Petitioner's direct examination.

**MEMORANDUM DECISION AND ORDER - 6**

At trial, Petitioner's version of this event was different. He testified that Lisa refused to follow his advice to wait to see whether the child's prescribed medicine for his swimmer's ear was going to work before taking him to the doctor again. He testified that she blew up and started screaming, and that he threatened to leave (and did leave) when she refused to stop screaming in front of the kids. (State's Lodging A-4, p. 1107.)

The record reflects that K.M. was acting unwell when he returned from Todd's at 2:45 p.m. on July 9 and never returned to his normal self. Petitioner described K.M. as being "real cranky," "just agitated," and wanting to be held by his mom more than usual on the evening of July 9 when he returned from Todd's house. (*Id.*, p. 1119.) Other witnesses who saw K.M. described him as quiet and lethargic for most of the night. K.M. was happy to see his sister when she returned from her trip. He acted a little more energized when she arrived. K.M. and K.B. batted around a mylar helium balloon together. K.M. was exuberant when he opened a gift from K.B. and found it was an Elmo shirt. He walked to the refrigerator by himself and retrieved a four-pack of pudding to show his grandfather. He exhibited a normal appetite at dinner, eating a Lunchable meal with his hands. After dinner he acted tired and declined to color in a coloring book his sister handed him. (*Id.*, pp. 1119-30.)

The next morning, Monday, July 10, Lisa had to work at the Boys and Girls Club. She was in charge of opening the facility, and usually left home about 6:45 or 6:50 a.m. (*Id.*, p. 783-84.) Petitioner had intended to go out to look for a job that day. (*Id.*, p. 790.)

Lisa awoke at approximately 5:15 a.m. and checked on K.M. She found him lying on his back with his eyes open, and noticed there was dry vomit in the bed. Lisa put

**MEMORANDUM DECISION AND ORDER - 7**

K.M. in the bathtub and noticed that he was "very, very pale" and was "really fussy that morning in the tub, which was unusual." (*Id.*, pp. 741-42.) K.M. was placed on Lisa and Petitioner's bed while she got ready for work. (*Id.*, p. 742.) K.B. remembered him lying on the bed watching cartoons when she said good-bye to him. (*Id.*, p. 827.)

Petitioner testified that, before Lisa left, K.M. was dry heaving and "that's when he kind of – his hands clenched [sic]," and "not much was coming up but he did – he did manager to spit some – it looked like a watery substance – up." (*Id.*, p. 1090.)

Petitioner testified that, after Lisa left, K.M. was lying in the bedroom for between 20 and 30 minutes. Petitioner said K.M. "started clenching up again. And it was like he was kind of bending over." (*Id.*, p. 1092.) Petitioner moved K.M. to the living room after K.M. threw up liquid again on the bed. (*Id.*)

After Lisa and K.B. arrived at the Boys and Girls Club, Lisa noticed that she had missed a call from Petitioner. She returned his call at approximately 7:54 a.m. Petitioner told her that K.M. was worse than when she had left, and that he was worried about K.M. He thought Lisa should come home immediately, and told her so. Lisa refused, telling Petitioner she could not come home until someone came to fill in for her. Lisa spoke to K.M. and told him she loved him, to which he responded "I, too." Lisa testified that K.M. sounded "droopy" on the phone. (*Id.*, at 1094.)

Petitioner testified that he decided to clean K.M. up and dress him, so that he would be ready to go to the doctor when Lisa returned. Petitioner testified he put K.M. on the kitchen counter to apply the impetigo medicine and to wet down and comb his hair, but then noticed the brush was not there. Petitioner left K.M. on the counter and

went to get the brush. Petitioner heard a thump and ran in to find K.M. on the floor.
Petitioner said K.M. "was getting these – he was going into these – just breathing, just
deep breath, like he couldn't catch his air." (State's Lodging A-4, pp. 1096-97.)
Petitioner testified that he thought the fall knocked the wind out of K.M. (*Id*., p. 1197.)

About 8:20 a.m., Petitioner—hysterical—called Lisa and demanded that she come
home immediately because "something was wrong" and K.M. "was not breathing right."
(*Id*., p. 746.) Lisa arrived home approximately ten minutes later. Lisa testified that, when
she entered the front door, K.M. was lying on the floor in the living room on a blanket,
struggling to breathe. He appeared to be having convulsions and his eyes were rolling
back into his head. (*Id*., p. 747.)

Petitioner did not call 911, because he "panicked" and "was scared." (*Id*., p. 1097.)
Petitioner did not tell Lisa that K.M. fell from the counter.

Lisa called 911 at 8:54 a.m. When the paramedics arrived about 5 minutes later, at
about 9:00 a.m., they immediately scooped up K.M. to rush him to the hospital. Based
on past experience, an attending paramedic, David Chenault, believed that K.M.'s non-
responsiveness was indicative of a major brain injury. He relayed this to Dr. Jay Hunter,
the emergency room doctor, upon arrival. (*Id*., pp. 1207-10.) Petitioner did not tell the
paramedics that K.M. fell from the counter, even though they scanned the house for
poisons and asked about possible choking. (*Id*., pp. 1099, 1126.) Even though K.M. was
obviously "in medical distress" and there was a flurry of action to diagnose and treat
him, Petitioner kept quiet and simply let the paramedics guess at what might be wrong
with K.M. (*Id*., pp. 1125-26.)

**MEMORANDUM DECISION AND ORDER - 9**

Dr. Hunter testified that K.M. "was breathing, had normal oxygen, had normal blood pressure, so should have been awake, [but] was unconscious," which immediately led Dr. Hunter to suspect "there was a severe neurological injury." (State's Lodging A-4, p. 861.) After a CAT scan, it was clear that K.M. needed a pediatric neurosurgeon and a pediatric intensive care environment that the Lewison facility could not provide. Dr. Hunter immediately made arrangements for K.M. to be flown to Spokane. (*Id.*, p. 864.)

Petitioner remembers the Lewiston hospital personnel rushing K.M. out the door for diagnostic testing. He also heard Dr. Hunter say, "This baby has Shaken Baby Syndrome." Petitioner was shocked. (*Id.*, p. 1099.) Petitioner still did not disclose that K.M. had fallen from the counter. While Petitioner was at the Lewiston hospital, police investigators asked him to come down to the police station for an interview. (*Id.*, p. 1100.) He did not tell investigators about K.M.'s fall. (*Id.*, p. 1126.)

Lisa and Petitioner drove to Spokane to be at the hospital with K.M. They were joined by Todd and his wife and extended relatives from both sides. At approximately 3:00 p.m., doctors informed Lisa that K.M. was not going to survive. He was declared brain dead the next day, July 11, at 9:20 a.m., which is the date of death listed on his death certificate. (*Id.*, pp. 755-56.)

Lisa and Todd approved an organ donation. K.M.'s heart was cross-clamped on July 12 at 6:15 a.m., which caused his cardiac death. The organs were harvested by a specialist who flew to Spokane to perform the procedure. K.M. was taken off life support. (State's Lodging A-4, pp. 755-57.) His body was delivered to the coroner, Dr. Marco Ross, for an autopsy, which began at 10:15 a.m. (State's Lodging A-13.)

**MEMORANDUM DECISION AND ORDER - 10**

According to the regular procedures for the coroner's office to seek more cause-of-death information in pediatric brain injury cases, K.M.'s brain was removed, "fixed" (meaning preserved), and sent to an out-of-state neuropathologist for a brain autopsy. (State's Lodging C-5.) The brain autopsy report was prepared by Dr. Ross Reichard of the University of New Mexico Office of the Medical Investigator. (*Id*.) The report does not specify the date the autopsy was performed.

The night of July 12, Petitioner was so upset that he did not want to return home, and so he and Lisa spent the night at Petitioner's father's house in Lewiston. When Lisa and Petitioner were alone, Petitioner tearfully told Lisa that something had happened to K.M. while he had been watching him on July 10. No one heard the first part of their conversation. From the other room, Petitioner's stepmother heard him say, "I'm sorry he fell," and she entered the room and asked Petitioner what he had said, whereupon Petitioner told her that K.M. had fallen from the kitchen counter. (*Id*., pp. 1158-59.)

Lisa testified: "He made me promise not to tell anybody, and that was something I was really torn up about." (*Id*., p. 760.) She told her parents, and her parents said to tell her attorney. (*Id*., p. 761.) Petitioner contrarily testified that he did not ask Lisa not to tell anyone: "That – that never came out of my mouth." (*Id*., p. 1105.) At another point in trial, when asked about the same thing, he said: "No. No, that was not me." (*Id*., p. 1126.)

Petitioner's mother testified that he was "just sobbing and crying and just beside himself" after he revealed to his family that K.M. had fallen off the counter before his death. (*Id*., pp. 1178-79.) However, on cross-examination at trial, Petitioner testified that he did not believe the fall off the counter caused any harm to K.M. (*Id*., p. 1128.)

**MEMORANDUM DECISION AND ORDER - 11**

While the exact causation of K.M.'s fatal injuries was a mystery, health care professionals who were involved in evaluating K.M. agreed that his death was a homicide. As discussed above, some doctors examined him in a fairly normal setting within months or days of his death (Doctors Schultz, Ambroson, and Chin), and several evaluated him when he was unconscious but alive (Doctors Hunter and Harper). After K.M.'s death, a pathologist (Dr. Ross) performed an autopsy which consisted of a visual examination of the body and a microscopic examination of injured tissues. A neuropathologist (Dr. Reichard) performed a visual and microscopic brain autopsy. Finally, a third pathologist (Dr. Arden, discussed under Claim 2 below) reviewed only the microscopic details of what was happening at the cellular level when the child died. All of these experts testified at trial, with the exception of the neuropathologist who performed the brain autopsy—his findings, conclusions, and absence from trial are at the heart of this case.

Medical and autopsy reports showed that K.M. had suffered both fatal head injuries and potentially-fatal abdominal injuries. Petitioner's trial counsel, Scott Chapman, defended Petitioner on the theory that K.M.'s injuries were inflicted several days before they manifested themselves, which would have placed the child in the biological father's custody at the time of injury. Therefore, timing of the injury was particularly at issue. The medical experts addressed the child's likely reactions to the extensive injuries.

As to the head injuries, the receiving emergency room doctor, Dr. Hunter, testified that the autopsy report showed that K.M. had subdural hematomas and a fair amount of

subarachnoid hemorrhage. (State's Lodgings A-4, pp. 872-75 and A-3, Dr. Marco Ross's Autopsy Report, quoting from Dr. Ross Reichard's brain autopsy report.) Dr. Hunter said that sometimes a subdural hematoma can be present for days or even months before symptoms appear, and the symptoms can suddenly worsen, increasing the pressure in the brain. But subarachnoid bleeding should have produced immediate symptoms, he opined. (*Id.*, pp. 874-75.)

Dr. Hunter testified that a fall from 36 inches would rarely produce a significant head injury like bleeding, and that he had never seen one occur in that way in all of his years of practice. "I don't think a fall with direct trauma—if it did produce a significant head injury, it would most likely produce a subdural hematoma. I don't think you can account for the subarachnoid hemorrhage-type of injury with that." (*Id.*, pp. 888-89.)

As to the abdominal injuries, Dr. Hunter testified: "If there were not a co-existing head injury to alter the child's level of consciousness and we just looked at the body injuries, I would expect this child to be in absolute agony." He further opined that, because "this child had numerous hemorrhages of the muscle ... I would expect that, plus the abdominal injuries, to produce just an incredible amount of pain." (*Id.*, p. 872.)

Dr. Deborah Harper, a pediatrician specializing in child abuse, was called in to examine K.M. after he arrived at the Spokane hospital and before he was declared brain dead. After the examination, Lisa told Dr. Harper that she believed the injuries occurred the day before, when K.M. had spent the night at his biological father's house. Dr. Harper told Lisa that such timing did not match what she saw upon examining K.M. (State's

Lodging A-4, p. 1031.) Drawing upon her expertise and based solely on her physical examination of K.M.'s head injury, Dr. Harper concluded that the child had been abused.

Dr. Harper did not believe that a fall from a 36-inch counter could have caused the brain injury. She testified that falls from as high as a bunk bed—which are very common—typically do not produce serious head injuries. (*Id*., pp. 1038-39.)

When Dr. Harper learned of the extensive abdominal injuries after the organ harvest and autopsy report, she became even more certain that the child's death was not accidental. She testified at trial: "Even among children I've seen who have died as a result of inflicted injury where somebody purposely hurt them, these – and again, the head trauma was bad, and the abdominal trauma was – was really more than I usually see." (State's Lodging A-4, p. 1034.) She described the force it would take to inflict such damage as something like "being on a horse and falling off and getting dragged behind it, maybe the horse stepping on your abdomen," or like being an "unrestrained passenger in a car." (*Id*.)

Dr. Harper, who is a pediatrician and not a pathologist, did not review any microscopic details of the injured tissues, but explained her general understanding of the significance of the presence of microscopic macrophages at an injury site:

> Macrophages means big eaters, and they're a type of red blood cells that go in and sort of – I won't say chomp up, because they don't really chomp up, but they engulf either germs or the red blood cells that have gone away. And so, they come fairly quickly and are usually done doing their work within a few days, although they can last longer in different people. But their job—that's what their job is. So it tells us that the body was continuing on its healing process.

**MEMORANDUM DECISION AND ORDER - 14**

(*Id.*, p. 1047.)

Dr. Harper testified that, as a pediatrician experienced in investigating child abuse, she did not need microscopic evidence to arrive at her conclusion, because of the nature and extent of the injuries:

> Q.   In your medical opinion, to a reasonable degree of medical certainty, in this case, is it necessary for you to go to the microscopic level in order to be certain of what happened to this child?
>
> A.   No, it's not. It's not necessary. We do that as part of our due diligence.
>
>                    *   *   *
>
> In [K.M.]'s case, it's good information. It is not necessary [for us to be able] to say that what we can just see with our eyes on the autopsy in his abdomen and his head is the cause of his death and was severe and [was] trauma with the immediate response of being unconscious.
>
> Q.   So, would you say that all this stuff about reactive cellular changes and mixed inflammatory cells and macrophages are all well and good, but that doesn't make any difference to the facts of what happened to him?
>
> A.   Correct. It – it corroborates what I'm saying, but it doesn't make any difference.

(*Id.*, pp. 1040-41.)

Dr. Harper focused not on the subdural hematomas present in K.M.'s brain as the mechanism of death, but on other brain injury:

> There can be a delayed response to subdural hematomas. In [K.M.'s] case, he has a subdural hematomas [sic], which are interesting that they're there, but that wasn't his main brain injury. His main brain injury was actually to the physical solid part of his brain.

**MEMORANDUM DECISION AND ORDER - 15**

(State's Lodging A-4, pp. 1052.) She concluded that the injury that killed K.M. was "the extremely serious brain injury that caused enormous brain swelling to the point that his brain pressure—the swelling was so great that the blood pumping from his heart could not get into the brain to feed the brain cells." (*Id*., pp. 1032.) She opined that K.M. would have been "unconscious, or semi-conscious" immediately, "probably not breathing well," and "obviously critically ill." (*Id*., p. 1033.) She contrasted K.M.'s condition of *subdural* hemorrhaging and subarachnoid hemorrhaging (which she said should have manifested itself immediately), with *epidural* hematoma and subarachnoid hemorrhaging (which she said can manifest itself days after the injury). (*Id*., p. 1036-437.)

Dr. Marco Ross, the forensic pathologist who performed the general autopsy on K.M., described "multiple contusions ... on the surface of the body, on the head, the extremities and the torso." (*Id*., p. 912.) On examination of the deep scalp, Dr. Ross noted bruising corresponding to the contusions or bruises on the left side of the forehead. He identified two larger hemorrhages and five smaller hemorrhages in the scalp area. (*Id*., p. 914.)  He identified a hemorrhage from bruising corresponding to the right side of the head. (*Id*., p. 915.)

Dr. Ross observed hemorrhages present in multiple layers of the retina, which were consistent with blunt force trauma. (*Id*., p. 926.) He also saw hemorrhages spread near the ora serrata, toward the front of the eye. He found sixteen hemorrhages in the right eye and eighteen in the left eye. (*Id*.) He testified that the large number of eye hemorrhages and the fact that they spread out toward the front of the eye were "more indicative of trauma." (*Id*.)

**MEMORANDUM DECISION AND ORDER - 16**

Dr. Marco Ross summarized the results of the brain autopsy performed by the

neuropathologist, Dr. Ross Reichard. (*See* State's Lodging C-5, Dr. Reichard's brain

autopsy report.) Dr. Reichard's conclusion was that there were bilateral subdural

hemorrhages (meaning occurring on both sides of the brain); there was also a bilateral

subarachnoid hemorrhage. (*Id.*, pp. 928-29.)

Dr. Ross commented about whether the age of the injury could be approximated

from the autopsy findings:

> Well, one can look at the – at the degree of
> inflammation, which is essentially a response of the tissues to
> an injury. When – when an injury occurs, the tissues respond
> by an inflammatory process. And what that means is there are
> special cells in the body called inflammatory cells. They get
> recruited to come to the site of the injury.
>
> And based upon the nature of the inflammation that
> occurs in the injured tissues, one can make an assessment as
> to the relative age of an injury. It's not extremely precise, but
> it does allow one to say whether or not injuries are, say,
> consistent with a given course of events.

 (*Id.*, p. 931.)

Discussing the abdominal injuries, Dr. Ross explained that the mesentery is a fatty

tissue that carries the blood supply for the intestines and helps anchor them in place; it

requires significant force to be injured. (*Id.*, p. 918.) He observed a lot of hemorrhage or

bruising in the mesentery, a laceration in the mesentery, a bruise on the large bowel, and

hemorrhage on the small intestine. (*Id.*, p. 919.) He opined that only a significant degree

of force would have produced that degree of hemorrhage. (*Id.*)

**MEMORANDUM DECISION AND ORDER - 17**

Dr. Ross explained that, to determine the age of an injury, he looks for both signs of inflammation and the presence of iron deposits. Dr. Ross microscopically examined various tissue samples and observed the type of inflammation he had explained. (State's Lodging, p. 931; State's Lodging A-13, Dr. Ross's autopsy report, pp. 13-15.)

A significant deposit of iron usually occurs three to four days after an injury, Dr. Ross testified. He did not observe any significant deposits of iron in the tissue samples he viewed. (State's Lodging A-13, Dr. Ross's autopsy report, pp. 13-15.) He opined, to a reasonable degree of medical probability, that the head and abdominal injuries occurred at approximately the same time—"less than a three-to-four-day range and probably more likely in the one- to two-day range for most of those injuries." (*Id*., p. 933.) Dr. Ross opined that the jaw and lower back injuries were considerably older, meaning a couple of days to weeks older. (*Id*., p. 932.)

Dr. Ross agreed with Dr. Hunter and Dr. Harper that a fall from a 36-inch high countertop was not likely to produce such injuries:

> Q.    There's been some testimony that the defendant has related a story about the infant falling from a counter, a kitchen counter, onto a linoleum floor. Would the injuries that you discovered during your autopsy be consistent with such a fall?
>
> A.    No, they would not.
>
> Q.    And can you explain to the jury why not?
>
> A.    Well, again, the degree of injury seen. First of all, the fact that there were multiple impact points on the head, not just one impact point on the head, which I would expect from a fall. In addition, the degree of hemorrhage in the brain, the corpus callosum tear, and the degree of retinal hemorrhages are all consistent with a very significant blunt force impact or

**MEMORANDUM DECISION AND ORDER - 18**

> impacts to the head that would be in excess of what would be expected from a fall to the floor.
>
> Q.   What about the abdominal injuries or the injuries to the back and the legs?
>
> A.   Well, the abdominal injuries as well. The – the back and legs, I can't entirely exclude the fact that a fall to the floor as described could have caused those. But the abdominal injuries, their distribution and the depth of injuries are inconsistent with a fall as described.

(State's Lodging A-4, pp. 936-37.)

Dr. Ross explained that the arachnoid is a layer of tissue that rests directly on the surface of the brain. Directly over that layer is the dura, which sticks to the inside surface of the skull. (*Id*. at 939-40.) "In this case, there was both hemorrhage in that subdural space, which is underneath the dura or between the dura and the arachnoid, and there's also blood in the subarachnoid space, which is the space between the arachnoid and the actual true surface of the brain tissue itself." (*Id*. at 940.)

Dr. Ross testified that, to cause the extensive brain injuries, "it would have taken a very significant force, in excess of certainly the described fall and would be more consistent with, I think, either a very high fall, we're talking about, you know, a couple of stories or so, the kind of a fall or something that you might see with a motor vehicle accident, or inflicted blunt force trauma." (*Id*., p. 945.)

On cross examination, Dr. Ross admitted that he did not make or analyze original slides or recuts of the brain tissues; only Dr. Reichard did. (*Id*., p. 952-59.) He admitted that the corpus callosum laceration Dr. Reichard recorded in the brain autopsy report could be identified only through microscopic examination. (*Id*., p. 956.)

**MEMORANDUM DECISION AND ORDER - 19**

However, Dr. Ross did prepare his own slides of other bodily tissues, which he explained at trial. (State's Lodging A-13, Dr. Ross's autopsy report, pp. 13-15). For example, in the small intestine slide there were "submucosal, intramuscular, and mesenteric hemorrhages with intramuscular, and mesenteric hemorrhages with infiltrates of mixed inflammatory cells and macrophages." (State's Lodging A-4, p. 970.) This meant there was both acute and chronic inflammatory cells present; frequently, this mix of cells will include macrophages and reactive cellular changes, such as enlarging of the nucleus in cells. (*Id.*, pp. 969-71.)

> Q.   And then iron stain demonstrates a few scattered sparse foci of iron-containing macrophages in the mesentery?
>
> A.   That's correct.
>
> Q.   And, again, that is indicative of at least some type of healing process having started?
>
> A.   Well, it can be. Now, one of the things, when you're looking at focal or very sparse collections, one can't rule out that in some of these situations, there is a normal degree of iron turnover that occurs in various tissues of the body. And one may be able to pick up a focal sparse iron that's present as a result of just the normal iron turnover.

(*Id.* at  971.) Dr. Ross's autopsy report shows that little to no iron deposits were found in the bodily injury slides he prepared and examined.

Dr. Ross further testified that unique changes to the brain begin to occur when the rest of the body is working but the brain is not:

> The inflammatory processes in the brain are somewhat different than what one sees in the rest of the body. Although, there are some parallels. A lot of times, they'll just be a

> liquefactive breakdown of the tissues with some very sparse acute inflammation. And then one may not see much inflammation beyond that, but what one begins to see if this process that's called gliosis, which means that part of the background cells, some of the cells that help give structure in the brain, but aren't nerve cells in and of themselves, that these glial cells begin a process where they become more reactive, and changes occur in those cells. Macrophages in the brain would be more likely to be present in the brain a few days after injury and would be more consistent with a later injury.

(State's Lodging A-4, pp. 975-76.)

Dr. Ross testified that Dr. Reichard's brain autopsy report noted that "[c]oronal sectioning of the cerebral hemispheres reveals the loss of clear distinction between the gray-white junction and generalized gray discoloration." (State's Lodging C-5, p. 1.) Dr. Ross explained that this "is typically seen in what we call a respirator brain, that it would refer to a case in which brain death has occurred, but there's still ongoing cardiac activity." (State's Lodging A-4, p. 984-85.) Dr. Ross further explained that "when a brain such as this that has been – and somebody has been brain dead for a period of time, but the body's still living, when we take the brain out initially, it's very soft. And if we do, you know, too much manipulation on it, it just sort of begins to fall apart."[4] (*Id*., p. 956.)

Dr. Ross testified that the presence of macrophages in the tissue slide from the right jaw area indicated that the injury underlying the bruised chin was about a week old.

---

[4] It does not seem that any expert addressed the interplay, if any, between the softness of the brain when it arrived at Dr. Ross's laboratory and the presence of a corpus callosum tear or of a piece of gray matter uncharacteristically found inside the tear in the white matter of the brain. See Dr. Jonathan Arden's opinion, *infra*, in the discussion of Claim 2.

**MEMORANDUM DECISION AND ORDER - 21**

(*Id.*, p. 981.) That slide came from the bruised area on the child's face that the biological father suspected was from child abuse—the subject of Dr. Chin's July 8th examination.

Dr. Ross agreed with defense counsel on cross-examination that, if there were macrophages in the brain, that would indicate the injury had occurred a "few days" earlier. (*Id.*, p. 976.) Dr. Ross clarified on redirect examination that there was nothing he had discussed at trial that was inconsistent with a timeline that shows the injuries occurred approximately 48 hours prior to cardiac death. (State's Lodging A-4, p. 987.) Because cardiac death occurred on July 12 at 6:15 a.m., Dr. Ross's testimony would place the injury occurrence no earlier than about 6:15 a.m. on July 10, which coincides with the time Petitioner was babysitting the child.[5] Ross testified that the causes of K.M.'s death were cerebral edema (brain swelling) and subdural hemorrhage due to blunt force impact to the head, and that the manner of death was homicide. (*Id.*, p. 988.)

After conviction, an unsuccessful direct appeal, and an unsuccessful state post-conviction matter, Petitioner filed this federal habeas corpus action, with the aid of counsel who represented him in his state post-conviction case. Petitioner brings two claims. Claim 1 asserts a violation of Petitioner's right to confront a non-testifying witness (Dr. Reichard) when his report was admitted into evidence and the state's medical experts testified, in part, about the findings and conclusions contained in the

---

[5] The Idaho Court of Appeals stated: "Because it was determined that K.M. was brain dead at 9:20 a.m. on July 11, Dr. Ross opined that Grove had been alone with K.M. during the window in which K.M.'s head injuries likely occurred—from around 7 a.m. to approximately 8:45 a.m. on July 10." (State's Lodging B-5, p. 5.) While this statement is not untrue, this Court concludes that Dr. Ross's opinion is more clearly stated as that the injury likely occurred within 48 hours of *cardiac* death.

written report. Claim 2 is an ineffective assistance of trial counsel claim based on counsel's failure to make a Confrontation Clause objection to admission of the Dr. Reichard evidence. (*Id*.)

## CLAIM ONE

### 1.    Fundamental Error as Procedural Default

Respondent argues that Petitioner's Confrontation Clause claim is procedurally defaulted, because he improperly raised it for the first time on direct appeal, rather than in the trial court by a contemporaneous objection. The Idaho Court of Appeals recognized the failure to object and rejected it under Idaho's fundamental error doctrine. (*See State v. Perry*, 245 P.3d 961, 980 (Idaho 2010).)[6] (State's Lodging B-5.)

---

[6] The Idaho Supreme Court recently clarified the second and third prongs of the *Perry* test in *State v. Miller*, 443 P.3d 129, 133 (2019), *reh'g denied* (June 12, 2019), but this Court will use *Perry*, which is the law the Idaho Court of Appeals applied in Petitioner's case. In *Miller*, the Idaho Supreme Court explained:

> First, we address the second prong of *Perry* that states "the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision." *Id*. We reemphasize that in order to satisfy this prong of *Perry* a defendant bears the burden of showing clear error in the record. This means the record must contain evidence of the error and the record must also contain evidence as to whether or not trial counsel made a tactical decision in failing to object. If the record does not contain evidence regarding whether counsel's decision was strategic, the claim is factual in nature and thus more appropriately addressed via a petition for post-conviction relief. As the Court of Appeals observed, when stating the second prong of *Perry* is satisfied, appellant's counsel often contends "it is clear from the record that the failure to object was not tactical" and that "failing to object could not have benefitted the defendant." *Miller*, No. 45028, 2018 WL 3413827, at *4 n. 2. However, neither of those statements demonstrates that it is clear that the record contains evidence that the failure to object was a tactical decision. Thus, we clarify that whether trial counsel made a tactical decision in failing to object is a claim that must be supported by evidence in the record. Appellate counsel's opinion that the decision could not have been tactical does not satisfy the second prong of *Perry*.

Petitioner raised the claim a second time on post-conviction review. The state district court determined that, because there was no objection, there could be no Confrontation Clause error. The state district court alternatively denied the claim on the merits. (State's Lodging C-1, p. 337.)

Petitioner filed a post-conviction appeal. Twice in its opinion rejecting Petitioner's claim as being improperly presented in a post-conviction matter, the Idaho Court of Appeals explained that he had not met the test to qualify for application of the fundamental error doctrine on direct appeal:

- "It is undisputed that trial counsel did not object to the admission of Dr. Ross's autopsy report, which incorporated Dr. Reichard's findings from the brain autopsy, nor did defense counsel object when medical experts testified regarding Dr. Reichard's findings. Grove raised the Confrontation Clause issue for the first time on direct appeal. This Court reviewed the claim under the fundamental error doctrine outlined in *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010). We determined that although the State did not dispute that an unwaived constitutional right was implicated, Grove was not able to meet the clear or obvious error prong of the analysis."

- "Grove was provided the avenue of asserting the Confrontation Clause issue as fundamental error[;] however, he failed to establish the *Perry* requirements."

(State's Lodging D-6, pp. 8-9 & 10.)

---

443 P.3d at 133.

As to the third prong, the Idaho Supreme Court clarified: "We take this opportunity to clarify that the third prong *of Perry* requires that the defendant demonstrate that the clear error in the record— i.e., the error identified in the first and second prongs—actually affected the outcome of the trial proceedings." *Id.*, at 133-34.

**MEMORANDUM DECISION AND ORDER - 24**

The threshold question in this habeas corpus matter is whether the Idaho Court of Appeals' denial of the Confrontation Clause claim under its fundamental error analysis constitutes a procedural or a merits-based ground for habeas corpus review. Recently, Chief District Judge David C. Nye determined that Idaho's fundamental error doctrine was not independent of federal law. *See Johnson v. Tewalt*, No. 1:18-CV-00216-DCN, 2019 WL 5053167 (D. Idaho Oct. 8, 2019). Judge Nye concluded that, for federal habeas corpus review purposes, claims rejected under the Idaho fundamental error doctrine are deemed merits decisions, rather than procedurally-defaulted claims because the doctrine rests primarily upon, or is interwoven with, federal law, and because the Idaho Supreme Court has not made a pronouncement that the doctrine is based solely on state law. *See, e.g.*, *Michigan v. Long*, 463 U.S. 1032, 1040–1041(1982); *Bennett v. Mueller*, 322 F.3 573, 582-83 (9th Cir. 2003).

Idaho's fundamental error analysis plainly requires a determination of whether "one or more of the defendant's unwaived constitutional rights were violated." *State v. Johnson*, 894 P.2d 125, 129 (Idaho 1995) (citing *State v. Perry*, 245 P.3d at 980). Further supporting the conclusion that Idaho's fundamental error doctrine is intertwined with federal law, the Idaho Court of Appeals in Petitioner's direct appeal case observed that fundamental error review is *necessary* to protect a defendant's due process rights, and is *premised upon* the United States Constitution: "[E]very defendant has a Fourteenth Amendment right to due process and it is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process." (State's Lodging B-5, p. 9, citing *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 876 (2009).) "Accordingly," the Idaho Court of

Appeals emphasized, "when an error has not been properly preserved for appeal through objection at trial, the appellate court's authority to remedy that error is strictly circumscribed to cases where the error results in the defendant being deprived of his or her Fourteenth Amendment due process right to a fair trial in a fair tribunal." (State's Lodging B-5, p. 9.)

Petitioner argues that the Idaho Court of Appeals should have used the fundamental error standard of law that existed at the time of trial, *Smith v. State*, 491 P.2d 733 (Idaho 1971), rather than *Perry*, which changed the law while Petitioner's case was on appeal. In *Smith*, the Idaho Court of Appeals adopted the New Mexico Supreme Court's fundamental error definition in *State v. Garcia*, 46 N.M. 302, 309, 128 P.2d 459, 462 (1942):

> Error that is fundamental must be such error as goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive. Each case will of necessity, under such a rule, stand on its own merits. Out of the facts in each case will arise the law.

*Smith*, 491 P.2d at 739 n.13. In *Smith*, the Idaho Supreme Court explained that an example of a "fundamental error" would be an instance where, "a felony offense is tried by a court with jurisdiction to try only misdemeanors." *Id*.

This Court concludes that both the *Smith* rule and the *Perry* rule primarily rest upon, or are interwoven with, federal law, and, thus, for federal habeas corpus purposes, it makes no difference which rule was used. Under either, Petitioner prevails on his argument that the Idaho Court of Appeals' decision in his case amounts to a merits-based

ruling, for the following reasons: (1) the appellate court's purpose in performing a fundamental error analysis was to ensure that Petitioner had not been deprived of his Fourteenth Amendment due process right to a fair trial in a fair tribunal, (2) the appellate court determined that an unwaived constitutional right was implicated (the Confrontation Clause), and (3) the appellate court decided that Petitioner did not demonstrate such a violation. Therefore, the direct appeal decision on Claim 1 will be entitled to deference under 28 U.S.C. § 2254(d).

**2.      Merits of Claim 1: No Clearly Established Precedent**

### A.  Standard of Law

Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), limits habeas corpus relief to instances where the state court's adjudication of the petitioner's claim:

1.      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

Subsection (d)(1) is at issue in Petitioner's case. Where a state court has ruled on the merits of a claim, a federal habeas court may not grant relief if the decision is merely erroneous. Relief is available only if the state court decision is so erroneous that it is unreasonable—meaning there is no possibility that any fairminded jurist could disagree that the state court's decision is in conflict with applicable United States Supreme Court

precedents. 28 U.S.C.A. § 2254(d)(1); *Nevada v. Jackson*, 133 S. Ct. 1990 (2013). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (citation omitted, punctuation altered).

"Clearly established federal law" means the governing legal principles set forth in the holdings—not the dicta—of  the United States Supreme Court, *Williams v. Taylor*, 529 U.S. 362, 412 (2000), as of "the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). The habeas statute does not require an identical factual pattern before a legal rule must be applied; to the contrary, state courts must reasonably apply the rules squarely established by the Supreme Court's holdings to the facts of each case. *White v. Woodall*, 572 U.S. 415, 427 (2014).

On the other hand, if a habeas court must *extend* a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. *Id*. Neither can a federal district court refine or sharpen a general principle of Supreme Court habeas corpus jurisprudence into a specific legal rule that the Supreme Court has not announced. *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014). A federal habeas court may not overrule a state court for holding a view different from its own when the precedent from the Supreme Court is, at best, ambiguous. *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

If no Supreme Court decision confronted the specific question presented by a state prisoner's federal habeas petition, the state court's decision cannot be "contrary to" any

**MEMORANDUM DECISION AND ORDER - 28**

holding from the Supreme Court to warrant federal habeas relief. *Woods v. Donald*, 575 U.S. 312, 317 (2015). Thus, if the circumstances of a state prisoner's case are only similar to the Supreme Court's precedents, then the state court's decision is not "contrary to" the holdings in those cases, and habeas corpus relief cannot be granted. *Id*. By the same token, a state court cannot unreasonably apply established federal law that does not exist. *See,* e.g., *Wright v. Van Patten*, 552 U.S. 120, 126 (2008); *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

### B. Discussion

Petitioner asserts his claim as a stand-alone Confrontation Clause claim, but it is a more complex issue than that. On post-conviction review, the state district succinctly identified the problem with Petitioner's argument: "Because there was no objection to the report or the testimony in this case, there cannot be a Confrontation Clause violation." (State's Lodging C-1, p. 336.)

Similarly, on direct appeal, the Idaho Court of Appeals properly framed the narrow issue in Petitioner's claim by quoting *State v. Adams*, 216 P.3d 146 (Idaho Ct. App. 2009):

> Appellate courts should be particularly careful in applying the fundamental error doctrine to what may be a matter of legitimate strategic or tactical choices by defense counsel which generally cannot be discerned from the record on appeal. *See Mintun v. State*, 144 Idaho 656, 662, 168 P.3d 40, 46 (Ct. App. 2007)....*We are of the view that trial courts should not be required or encouraged, in any but the most extreme circumstances, to interfere with legitimate tactics of counsel*....Therefore, we will not find fundamental error in such *trial court inaction* in the absence of a clear record.

(State's Lodging B-5, p. 11 (emphasis added).)

The particular question here is whether admission of the Dr. Reichard evidence that arguably was contrary to the Confrontation Clause rose to the level of a Due Process Clause violation, requiring the trial court to intervene in the absence of an objection from defense counsel. To review the merits of this claim, the Court must look to United States Supreme Court precedent that was published prior to February 2, 2017, the date that the Idaho Supreme Court implicitly adopted the Idaho Court of Appeals' opinion when it denied Petitioner's petition for review on February 2, 2017. (State's Lodging D-6.)

Not surprisingly, there is no on-point United States Supreme Court precedent to govern the broader issue presented in this case. In *Kirby v. United States*, 174 U.S. 47 (1899), the Supreme Court discussed the right of confrontation as a fundamental constitutional principle required for a fair trial. There, the trial court had admitted, over Mr. Kirby's objection, the record of guilty-plea convictions of his co-defendants to prove that the property at issue had been stolen from the United States. No other evidence was admitted to prove this element of the crime. The United States Supreme Court reversed the trial court's decision, observing:

> One of the fundamental guaranties of life and liberty is found in the sixth amendment of the constitution of the United States, which provides that 'in all criminal prosecutions the accused shall * * * be confronted with the witnesses against him.' Instead of confronting Kirby with witnesses to establish the vital fact that the property alleged to have been received by him had been stolen from the United States, he was confronted only with the record of another criminal prosecution, with which he had no connection, and the evidence in which was not given in his presence.

**MEMORANDUM DECISION AND ORDER - 30**

* * *

The presumption of the innocence of an accused attends him
throughout the trial, and has relation to every fact that must
be established in order to prove his guilt beyond reasonable
doubt.

* * *

But that presumption in Kirby's case was, in effect, held in
the court below to be of no consequence.... In other words,
the United States, having secured the conviction of Wallace,
Baxter, and King, as principal felons, the defendant, charged
by a separate indictment with a different crime (that of
receiving the property in question, with knowledge that it was
so stolen, and with intent to convert it to his own use or gain),
was held to be presumptively or prima facie guilty, so far as
the vital fact of the property having been stolen was
concerned, as soon as the government produced the record of
such conviction, and without its making any proof whatever
by witnesses confronting the accused of the existence of such
vital fact. We cannot assent to this view. We could not do so
without conceding the power of the legislature, when
prescribing the effect as evidence of the records and
proceedings of courts, *to impair the very substance of a right
long deemed so essential for the due protection of life and
liberty that it is guarded against legislative and judicial
action by provisions in the constitution of the United States*
and in the constitutions of most, if not of all, the states
composing the Union.

*Id.*, 174 U.S. at 55–56 (emphasis added). The Court notes the important distinction that

Mr. Kirby objected, and the trial court acted contrary to that objection. The Court also

notes that "fundamental error" offends the very substance of foundational federal

constitutional protections afforded defendants in criminal cases.

In contrast, in *Hill v. United States*, 368 U.S. 424 (1962), the Court rejected Mr.

Hill's contention that the trial court was required by the Constitution to sua sponte

prompt Mr. Hill to exercise the right to an allocution at sentencing afforded him by

Federal Rule of Criminal Procedure 32(a):

> The failure of a trial court to ask a defendant represented by an attorney whether he has anything to say before sentence is imposed is not of itself an error of the character or magnitude cognizable under a writ of habeas corpus. It is an error which is neither jurisdictional nor constitutional. It is not *a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure*. It does not present 'exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.' *Bowen v. Johnston*, 306 U.S. 19, 27, 59 S.Ct. 442, 446, 83 L.Ed. 455. *See Escoe v. Zerbst*, 295 U.S. 490, 55 S.Ct. 818, 79 L.Ed. 1566; *Johnston v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; *Walker v. Johnston*, 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830; *Waley v. Johnston*, 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302.

*Id*. at 428 (emphasis added).

While the facts and procedural context differ from Petitioner's case, *Hill* provides

valuable instruction and examples of what is and is not a fundamental error. For example,

in *Johnston v. Zerbst*, cited by *Hill*, the Court identified the need to overlay the

Fourteenth Amendment's protective pavilion on the Sixth Amendment right to counsel:

"The purpose of the constitutional guaranty of a right to counsel is to protect an accused

from conviction resulting from his own ignorance of his legal and constitutional rights,

and the guaranty would be nullified by a determination that an accused's ignorant failure

to claim his rights removes the protection of the Constitution." *Id*., 304 U.S. at 465. What

can be gleaned from all of these cases is that fundamental error in applying any

constitutional principle must be of such a magnitude that it deprived the defendant of a fair trial, or it is not, by nature, fundamental error.

The Court now turns to Confrontation Clause precedent. A series of United States Supreme Court cases governing Confrontation Clause issues existed in 2017; however, each case involved evidence that was admitted over an objection of defense counsel. There was no existing case explaining when it is appropriate for a trial court to sua sponte raise the issue of the potential inadmissibility of non-testifying expert reports, especially where the parties stipulated to the authenticity of documents and reserved the right to object to admissibility at trial, but defense counsel chose not to object. The following brief outline of the law illustrates that Petitioner's case does not warrant relief, because the Idaho Court of Appeals' decision was not contrary to, or an unreasonable application of, existing United States Supreme Court precedent.

### i. *Crawford v. Washington*

The Supreme Court of the United States outlined the basic rules required by the Confrontation Clause in *Crawford v. Washington*, 541 U.S 36, 53-54 (2004). In that case, Mr. Crawford's wife, Sylvia, witnessed Mr. Crawford stab the victim. At trial, he claimed self-defense. Sylvia did not testify because of the state marital privilege. Because the privilege does not extend to a spouse's out-of-court statements admissible under a hearsay exception, the State sought to introduce Sylvia's tape-recorded statements to the police as evidence that the stabbing was not in self-defense. Mr. Crawford objected that admission of the statements would violate his federal constitutional right to be

"confronted with the witnesses against him." *Id*. at 55. The trial court admitted the evidence over his objection. After conviction, Mr. Crawford appealed.

In reviewing the case, the Supreme Court recognized that the requirement of confrontation dated back to the framers of the Constitution and had remained relatively unchanged in American jurisprudence. The rule is simply stated: "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.*, 541 U.S. at 59. Applying that rule, the Court concluded:

> In this case, the State admitted Sylvia's testimonial statement against petitioner, despite the fact that he had no opportunity to cross-examine her. That alone is sufficient to make out a violation of the Sixth Amendment. [W]e decline to mine the record in search of indicia of reliability. Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.

*Id.*, 541 U.S. at 68–69.

*Crawford* definitely did not address whether out-of-court expert witness reports presented by in-court expert witnesses are considered "testimonial statements." Nor did *Crawford* confront the question of whether a trial court has any duty to act when a witness begins to testify about an out-of-court report and opposing counsel does not object.

  ii.  <u>*Davis v. Washington*</u>

In *Davis v. Washington*, 547 U.S. 813 (2006), the Supreme Court combined review of two Confrontation Clause issues from two separate state cases. One required

**MEMORANDUM DECISION AND ORDER - 34**

the Court to determine whether a victim's identification of a defendant during a 911 call was "testimonial." The other focused on whether a victim's written statements in an affidavit given to a police officer during the investigation of a potential crime was a "testimonial statement." The United States Supreme Court decided that the first instance was nontestimonial, but the second was testimonial and subject to the Confrontation Clause.

The Supreme Court expressed its unwillingness "to produce an exhaustive classification of all conceivable statements ... as either testimonial or nontestimonial," but ultimately concluded that out-of-court statements are "testimonial when the circumstances objectively indicate that there is no ... ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. at 822, 813. Like *Crawford*, *Davis* did not address primary expert witnesses testifying about secondary out-of-court expert reports, nor did it address a trial court's sua sponte duty to determine questions of admissibility.

iii.     *Melendez-Diaz v. Massachusetts*

The year after Petitioner's trial but well before the Idaho appellate courts reviewed his Confrontation Clause claim, the United States Supreme Court decided *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). In that case, Mr. Melendez–Diaz was charged with cocaine trafficking. Drug quantity was at issue. At trial, the prosecution submitted three "certificates of analysis" showing the results of the forensic testing performed on the seized substances. The certificates reported the weight of the substance and identified

it as cocaine. A notary public had notarized the analysts' sworn signatures on the certificates.

Mr. Melendez-Diaz objected to the admission of the certificates, asserting that *Crawford v. Washington* required the analysts to testify in person. The trial court overruled the objection, and the certificates were admitted pursuant to state law as "prima facie evidence of the composition, quality, and the net weight of the narcotic ... analyzed." 557 U.S. at 308–09.

The United States Supreme Court concluded that the certificates fell within the "core class of 'testimonial' statements" that included "affidavits," regardless of their denomination as "certificates." *Melendez-Diaz*, 557 U.S. at 310. This conclusion rested on the finding that the certificates were a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact'"—the dictionary definition of "testimony" cited in *Crawford. Melendez-Diaz*, 557 U.S. at 310 (citing *Crawford*, 541 U.S. at 51). The Court reasoned:

> The fact in question is that the substance found in the possession of Melendez–Diaz and his codefendants was, as the prosecution claimed, cocaine—the precise testimony the analysts would be expected to provide if called at trial. The "certificates" are functionally identical to live, in-court testimony, doing "precisely what a witness does on direct examination." *Davis v. Washington*, 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (emphasis deleted).
>
> Here, moreover, not only were the affidavits "'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,'" *Crawford, supra*, at 52, 124 S.Ct. 1354, but under Massachusetts law the sole purpose of the affidavits was to provide "prima facie evidence of the

composition, quality, and the net weight" of the analyzed substance, Mass. Gen. Laws, ch. 111, § 13. We can safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose—as stated in the relevant state-law provision—was reprinted on the affidavits themselves. See App. to Pet. for Cert. 25a, 27a, 29a.

In short, under our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial and that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to "'be confronted with'" the analysts at trial. *Crawford*, supra, at 54, 124 S.Ct. 1354.

557 U.S. at 310. Upon that basis, the Court concluded that the "Sixth Amendment does not permit the prosecution to prove its case via ex parte out-of-court affidavits, and the admission of such evidence against *Melendez-Diaz* was error." *Id*., p. 329.

This case qualifies as clearly-established law governing admission of scientific reports admitted over trial counsel's objection. It would have been applicable to Petitioner's case had trial counsel objected to admission of Dr. Reichard's report *and* had the trial court admitted it over his objection. However, on the record before the Idaho appellate courts, there was no legal basis to conclude that a Confrontation Clause error occurred. Because there was no objection in Petitioner's case, he presents a different set of facts here not governed by the holding in *Melendez-Diaz*.

     iv.      <u>*Bullcoming v. New Mexico*</u>

In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the United States Supreme Court decided a case even closer to Petitioner's Confrontation Clause issue:

On the day of trial, the State announced that it would not be calling SLD analyst Curtis Caylor as a witness because

he had "very recently [been] put on unpaid leave" for a reason
not revealed. 2010–NMSC–007, ¶ 8, 147 N.M. 487, 492, 226
P.3d 1, 6 (internal quotation marks omitted); App. 58. A
startled defense counsel objected. The prosecution, she
complained, had never disclosed, until trial commenced, that
the witness "out there ... [was] not the analyst [of
Bullcoming's sample]." *Id*., at 46. Counsel stated that, "had
[she] known that the analyst [who tested Bullcoming's blood]
was not available," her opening, indeed, her entire defense
"may very well have been dramatically different." *Id*., at 47.
The State, however, proposed to introduce Caylor's finding as
a "business record" during the testimony of Gerasimos
Razatos, an SLD scientist who had neither observed nor
reviewed Caylor's analysis. *Id*., at 44.

Bullcoming's counsel opposed the State's proposal.
*Id*., at 44–45. Without Caylor's testimony, defense counsel
maintained, introduction of the analyst's finding would
violate Bullcoming's Sixth Amendment right "to be
confronted with the witnesses against him." *Ibid*. The trial
court overruled the objection, *id*., at 46–47, and admitted the
SLD report as a business record, *id*., at 44–46, 57.3 The jury
convicted Bullcoming of aggravated DWI, and the New
Mexico Court of Appeals upheld the conviction, concluding
that "the blood alcohol report in the present case was non-
testimonial and prepared routinely with guarantees of
trustworthiness." 2008–NMCA–097, ¶ 17, 144 N.M. 546,
552, 189 P.3d 679, 685.

*Id*., 564 U.S. at 655–56.

The United States Supreme Court disagreed with the New Mexico Court of

Appeals and found the report testimonial. The Court determined that Mr. Bullcoming's

right to confrontation was violated when the state court "permitted the testimonial

statement of one witness, *i.e*., Caylor, to enter into evidence through the in-court

testimony of a second person, *i.e*., Razatos." *Id*. at 658. Explaining the reasoning behind

the decision, the United States Supreme Court stated:

**MEMORANDUM DECISION AND ORDER - 38**

> More fundamentally, as this Court stressed in *Crawford*, "[t]he text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." 541 U.S., at 54, 124 S.Ct. 1354. Nor is it "the role of courts to extrapolate from the words of the [Confrontation Clause] to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values." *Giles v. California*, 554 U.S. 353, 375, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008) (plurality). Accordingly, the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination.

*Id.*, 564 U.S. at 662.

*Bullcoming*'s majority opinion makes it clear that, if a party demands to confront the originator of factual matter presented in writing or in person, then that party has a Sixth Amendment right to do so, "unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *Id*. at 657. However, *Bullcoming* did not address what happens when a party does not demand the right to confrontation. It did not set forth a rule governing when a trial court must sua sponte identify and rule upon whether an in-court expert can present the findings or conclusions of an out-of-court expert to avoid violating the defendant's due process rights.

        v.        <u>*Williams v. Illinois*</u>

In *Williams v. Illinois*, 567 U.S. 50 (2012), a plurality opinion, the Court confronted a perplexingly complex question—whether permitting expert witnesses to discuss scientific findings by out-of-court experts violates the Confrontation Clause when

the out-of-court testimonial statements "were not themselves admitted as evidence." *Id*. at

67. The Court emphasized the difference between the question in in *Bullcoming* and the

question in *Williams*:

> In concurrence [in *Bullcoming*], Justice Sotomayor
> highlighted the importance of the fact that the forensic report
> had been admitted into evidence for the purpose of proving
> the truth of the matter it asserted. She emphasized that "this
> [was] not a case in which an expert witness was asked for his
> independent opinion about underlying testimonial reports that
> were not themselves admitted into evidence." 564 U.S., at —
> —, 131 S.Ct., at 2722 (opinion concurring in part) (citing
> Fed. Rule Evid. 703). "We would face a different question,"
> she observed, "if asked to determine the constitutionality of
> allowing an expert witness to discuss others' testimonial
> statements if the testimonial statements were not themselves
> admitted as evidence." *Id*., at ——, 131 S.Ct., at 2722.

567 U.S. at 67.

In the plurality opinion authored by Justice Alito, in which Chief Justice Roberts,

and Justices Kennedy and Breyer joined, and in which Justice Thomas concurred in the

judgment, though on a different rationale, the Supreme Court determined in *Williams*:

> We now conclude that this form of expert testimony
> does not violate the Confrontation Clause because that
> provision has no application to out-of-court statements that
> are not offered to prove the truth of the matter asserted. When
> an expert testifies for the prosecution in a criminal case, the
> defendant has the opportunity to cross-examine the expert
> about any statements that are offered for their truth. Out-of-
> court statements that are related by the expert solely for the
> purpose of explaining the assumptions on which that opinion
> rests are not offered for their truth and thus fall outside the
> scope of the Confrontation Clause. Applying this rule to the
> present case, we conclude that the expert's testimony did not
> violate the Sixth Amendment.

*Williams*, 567 U.S. at 57-58. The dissenting Justices disagreed that the non-testifying

expert's testimony had not been offered for the truth of the matter. *Id*. at 2269 (Kagan, J.,

dissenting, joined by Scalia, Ginsburg, and Sotomayor).[7]

Justice Breyer particularly addressed autopsy reports in his concurring opinion:

> Autopsies, like the DNA report in this case, are often
> conducted when it is not yet clear whether there is a particular
> suspect or whether the facts found in the autopsy will
> ultimately prove relevant in a criminal trial. Autopsies are
> typically conducted soon after death. And when, say, a
> victim's body has decomposed, repetition of the autopsy may
> not be possible. What is to happen if the medical examiner

---

[7] Justice Kagan wrote:

> Under our Confrontation Clause precedents, this is an open-and-shut
> case. The State of Illinois prosecuted Sandy Williams for rape based in
> part on a DNA profile created in Cellmark's laboratory. Yet the State did
> not give Williams a chance to question the analyst who produced that
> evidence. Instead, the prosecution introduced the results of Cellmark's
> testing through an expert witness who had no idea how they were
> generated. That approach—no less (perhaps more) than the
> confrontation-free methods of presenting forensic evidence we have
> formerly banned—deprived Williams of his Sixth Amendment right to
> "confron[t] ... the witnesses against him."

> The Court today disagrees, though it cannot settle on a reason why.
> Justice Alito, joined by three other Justices, advances two theories—that
> the expert's summary of the Cellmark report was not offered for its truth,
> and that the report is not the kind of statement triggering the
> Confrontation Clause's protection. In the pages that follow, I call Justice
> Alito's opinion "the plurality," because that is the conventional term for
> it. But in all except its disposition, his opinion is a dissent: Five Justices
> specifically reject every aspect of its reasoning and every paragraph of its
> explication. See ante, at 2255 – 2256 (Thomas, J., concurring in
> judgment) ("I share the dissent's view of the plurality's flawed
> analysis"). Justice Thomas, for his part, contends that the Cellmark
> report is nontestimonial on a different rationale. But no other Justice
> joins his opinion or subscribes to the test he offers.

> That creates five votes to approve the admission of the Cellmark report,
> but not a single good explanation.

*Williams*, 567 U.S. at 119–20 (Kagan, J., dissenting).

**MEMORANDUM DECISION AND ORDER - 41**

dies before trial? Is the Confrontation Clause effective to
function as a statute of limitations for murder?

*Id.*, pp. 97-98 (Breyer, J., concurring).

In any event, the question answered in *Williams* is *not* the question raised in
Petitioner's case. Here, Dr. Reichard's testimonial statements were (1) admitted into
evidence, (2) without objection from Petitioner's counsel. (See State's Lodging D-6, p.
8.) In *Williams*, the out-of-court test results were not admitted into evidence, and defense
counsel moved to exclude the in-court expert's testimony about the tests based on the
Confrontation Clause. 567 U.S. at 62-63. Setting aside Justice Kagan's indisputably
correct observation that the plurality opinion in *Williams* has little common ground from
which to extract a principle of law, this Court concludes that *Williams* is factually distinct
from, and cannot serve as, clearly-established law for Petitioner's case.

### C. Conclusion

Accordingly, Claim 1 fails under AEDPA review because the Idaho Court of
Appeals' opinion, as implicitly adopted by the Idaho Supreme Court's denial of
Petitioner's petition for review, is not contrary to or an unreasonable application of
United States Supreme Court precedent existing in 2017—whether the question is
considered under the Confrontation Clause alone (there can be no Confrontation Clause
error without an objection) or under the broader umbrella of the Due Process Clause
(there is no precedent governing when a trial court should intervene into questions of
admissibility of evidence in the absence of objections from counsel).

**3.      Alternative De Novo Merits Analysis: Failure to Meet "Clear Error" Prong of Fundamental Error Test**

Having carefully reviewed the two decisions of the Idaho Court of Appeals on the Confrontation Clause issue, this Court concludes that Petitioner's claim alternatively fails on de novo review because, first, there was no objection; and, second, it cannot constitute a federal constitutional violation because it does not meet the clear error prong of the fundamental error analysis.

### A.  State Court Opinions

On direct review of this claim, the Idaho Court of Appeals explained that a trial court should not—on its own—become involved in questions of evidence that may be a matter of attorney case strategy. The fundamental error rule has been developed to foreclose an appellate court from dictating to a trial court that, when lawyers do not question the admissibility of evidence, the trial court should step in and do so. (*See,* State's Lodging B-5, p. 11, citing *State v. Adams*, 216 P.3d 146 (Ct. App. 2009).) For that reason, a Confrontation Clause error must be "clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision." (State's Lodging B-5, p. 9.)

That is, only when the trial transcript is clear that it would not be reasonable for either the court or defense counsel to allow the testimony, then the appellate court properly may find that the trial court's failure to act violated the defendant's due process rights. This is the crux of the matter. Petitioner can point to no state or federal precedent laying down a rule demonstrating that the trial court's inaction, in the face of no objection

from defense counsel, amounted to a constitutional error—either under the Confrontation

Clause or the broader Due Process Clause.

In its analysis, the Idaho Court of Appeals noted: "Importantly, in the context of

this case, it is well established that counsel's choice of witnesses, manner of cross-

examination, and lack of objection to testimony fall within the area of tactical, or

strategic, decisions." (State's Lodging B-5, p. 12, citing *Giles v. State*, 77 P.2d 365, 368

(1994).) Particularly addressing Petitioner's trial, the Idaho Court of Appeals reasoned

and concluded:

> [W]e cannot ascertain from the record whether Grove's
> failure to object to Dr. Ross's and Dr. Harper's testimony as
> to Dr. Reichard's findings and conclusions was not a tactical
> decision—the record simply does not eliminate the possibility
> that the failure to object was strategic. In assessing whether to
> object in this instance, defense counsel would have not only
> had to weigh the best case scenario that the testimony would
> be excluded, but also the more likely possibility that a timely
> objection would have prompted the state to subpoena Dr.
> Reichard to "defend" his findings and conclusions. Had that
> occurred, anything short of the unlikely circumstance of Dr.
> Reichard admitting that he erred in his methods and/or
> findings would have resulted in diminishing the ability for
> Grove to argue that Dr. Reichard's findings were "faulty" and
> thus question the reliability of the testimony of each doctor
> that relied on the brain autopsy to come to the conclusion that
> the injuries must have been inflicted during the time that
> Grove was alone with K.M.—as he did at trial both through
> cross-examination of Dr. Ross and through the testimony of
> Dr. Arden. To refrain from objecting and instead attack Dr.
> Reichard's report in absentia is certainly a viable trial
> strategy, and thus *we cannot say that it would not be*
> *reasonable for either the court or defense counsel to allow*
> *the testimony*.

(State's Lodging B-5, p. 12 (emphasis added).)

**MEMORANDUM DECISION AND ORDER - 44**

In the wake of the direct appeal opinion, Petitioner argued that he should be permitted to bring the Confrontation Clause claim on post-conviction review, because it had been determined that the claim required extra-record evidence, something that could not be presented on direct appeal. On appeal of the dismissal of his post-conviction petition, the Idaho Court of Appeals again reviewed the claim, but emphasized that it was not properly brought on post-conviction review.[8] The improper presentation notwithstanding, the appellate court considered Petitioner's extra-record evidence—the testimony of Petitioner's trial counsel. (State's Lodgings D-1 & D-2.)

The additional post-conviction evidence merely cemented the Idaho Court of Appeals' earlier decision:

> [On direct appeal,] [t]his Court stated that "the record simply does not eliminate the possibility that the failure to object was strategic." *Grove*, 151 Idaho at 492, 259 P.3d at 638. The deposition of trial counsel, taken after we issued our decision on direct appeal, reinforced this proposition. Trial counsel testified that the autopsy report contained bad facts for his theory of the case and he thought it would have been better to exclude it. However, he felt that the expert testifying for the defense, Dr. Arden, would "poke enough holes ... to make ... reliance on that report misplaced."

---

[8] The Idaho Court of Appeals did not agree with Petitioner that an unpreserved trial error could be raised as a stand-alone claim in a post-conviction matter. The appellate court pointed out that extra-record evidence would not have been necessary if counsel had objected and "made a proper record as to Dr. Reichard's report." (State's Lodging D-6, p. 10.) Where an attorney error might have been due to tactics or strategy, the proper way to bring such a claim is to assert an ineffective assistance of counsel claim on post-conviction review, unless the error is so obvious and egregious that it amounts to fundamental error.

(State's Lodging D-6, pp. 9-10.) Having considered the testimony of trial counsel, the state post-conviction court concluded, "Grove has failed to show error in the summary dismissal of the constitutional violation claim." (*Id*.)

## B. Discussion

In reviewing Claim 1, this Court agrees with the state district and appellate courts that whether a contemporaneous objection was made makes all the difference in the analysis of admission of an out-of-court testimonial statement. Where an objection is made, Confrontation Clause concerns apply. Where an objection was not made, the Due Process Clause is the overarching concern.

The nature of "fundamental error" means that the confrontation error was of such a magnitude and so obvious that the trial transcript alone will show whether admission of evidence was beyond the bounds of the trial strategy revealed in the record and so prejudicial that it could not possibly have been a tactical decision; and, hence, it should have been corrected sua sponte by trial court action to preserve the defendant's due process right to a fair trial. Turning to the facts of Petitioner's case, the Court concludes that, far from being unclear about whether the failure to object to the admission of the evidence was tactical or strategic, the defense strategy manifested in the trial transcript strongly supports the finding and conclusion that trial counsel *did* think about the question of whether he would rather have Dr. Reichard testify in person or have only the summary of his opinions be presented by the other doctors in court. He decided that the latter would be less harmful.

It is clear to this Court from the trial transcript alone that Defendant's trial counsel had an overall strategy in mind with respect to the State's expert witnesses and his own expert witness, and that his tactics throughout his trial preparation and presentation tracked his strategy. Before trial, the parties stipulated that the medical records— including the general autopsy record that incorporated the brain autopsy report from the University of New Mexico—would not have to be authenticated at trial. However, in their stipulation, Petitioner reserved the right to raise any other objection that might be applicable to the admissibility of the records. (See State's Lodging A-2, p. 212-13.) This stipulation demonstrates that Petitioner's trial counsel was well-aware in advance of trial that he could have objected to the brain autopsy report being admitted or discussed by testifying experts.

To support the defense, trial counsel hired forensic pathologist Jonathan Arden to examine the status of healing being carried out in the brain cells at the time of K.M.'s cardiac death. Defense counsel did not direct Dr. Arden to prepare a report before trial. Counsel wanted to surprise the prosecution with Dr. Arden's specific criticisms of the autopsy reports. On cross-examination, the prosecutor pointed out to Dr. Arden that, if he *had* prepared a written report, the defense "would have been required to turn it over to the State for review." (State's Lodging A-4, p. 1320.)

Defense counsel also chose not to question any of the State's witnesses about the potential problems in Dr. Reichard's report—particularly, the fact that there was a piece of grey matter in the corpus callosum slide, suggesting the "laceration" had *not* happened as part of the injury, but instead when the brain was being sliced apart and prepared for

**MEMORANDUM DECISION AND ORDER - 47**

testing and shipment. Had defense counsel revealed these opinions in a report, the prosecutor likely would have called Dr. Reichard to testify in person to defend his own work and opinions.

The strategy of minimal defense disclosure put the prosecutor under extreme pressure at trial. The prosecutor pointed out during cross-examination that Dr. Arden had refused to discuss the details and specifics of his testimony with the prosecution. Dr. Arden responded, "Yes, I agreed to give you [only] areas of testimony and the basic opinions that I would be providing today at testimony." (*Id.*, p 132.) The prosecutor also remarked that he had little time to prepare for the cross-examination of Dr. Arden. When discussing microphages, the prosecutor said, "I know it's very complicated, and I tried to educate myself in 12 hours or whatever." (*Id.*, p. 1342.)

The trial transcript alone does not demonstrate that the trial court should have taken the extraordinary measure to sua sponte preclude Dr. Reichard's report. The prosecution used the report in its case in chief. That means that, when the first prosecution witness began discussing Dr. Reichard's report, the trial court would have had to instantly recall defense counsel's opening statement to discern his trial strategy or stop the trial to question defense counsel about whether allowing admission of the report was a tactic in support of his trial strategy.

Consider the scene, had the trial court done so. First, if the defense attorney revealed his strategy (which was one of ambush) to support his nonobjection, then the strategy, by its very nature, likely would have been destroyed. Second, the prosecutor likely would have objected that the trial court was expressing a bias in favor of the

defendant. Third, the prosecutor also would have objected to the trial court sua sponte refusing to admit the report without advance notice and would have demanded an opportunity to meet such a surprise with additional time to produce Dr. Reichard at trial—either in person or via video conferencing from New Mexico. A "surprise" sprung on counsel in the midst of a criminal trial often is synonymous with a due process violation claim on appeal.

And, the Court must consider what would have happened if Dr. Reichard's report *had* been excluded by the trial court and the prosecution had *not* demanded time to produce Dr. Reichard at trial. The Court concludes that each testifying doctor's own examinations of K.M. and Dr. Ross's autopsy report contained substantial information for the other doctors to form their own opinions about K.M.'s cause of death.

During the general autopsy, Dr. Ross particularly observed and counted the number of injuries to both of K.M.'s eyes and the bilateral nature of the head injuries, which, he said, could not have occurred from a fall. Dr. Ross had done his own microscopic analysis using iron staining to identify the status of inflammation in the wounds. He also was able to anticipate some of Dr. Arden's testimony from trial counsel's opening statement and testify that microscope dating analysis was not exact, and that the brain's reaction to injury was slightly different from the rest of the body. His microscopic findings in the abdominal injury tissue slides led him to opine that the injuries were about 48 hours old.

Dr. Harper would have testified and did testify that the microscopic findings were unnecessary to document the time of injury because the bodily injuries were so obvious.

MEMORANDUM DECISION AND ORDER - 49

Petitioner argued in closing that Dr. Harper testified far beyond her expertise; regardless, Dr. Harper did not rely on or need Dr. Reichard's findings to formulate her opinion as a pediatrician who specialized in identifying child abuse.

Dr. Chin, the emergency room doctor who examined K.M. four days before K.M.'s cardiac death, testified that, because he had been particularly asked by K.M.'s biological father to check for signs of child abuse—and because he did so, photographing the bruises on K.M.'s face and body—he would not have missed the abdomen wounds had they been present at that time. He also did a retinal and ophthalmic examination, which was negative. Dr. Chin's analysis did not require Dr. Reichard's report. He also still would have been able to testify that this was one of the most brutal abuse cases he had ever seen, based on the general autopsy report of the bilateral eye injury, bilateral head injury, and severe abdominal injury report by Dr. Ross.

Focusing on the abdominal injuries, Dr. Hunter testified that K.M. had numerous hemorrhages in the muscles. He opined that the muscle hemorrhaging, plus the abdominal injuries, would have produced "just an incredible amount of pain." (State's Lodging A-4, p. 872.) Dr. Hunter's testimony about the abdominal injuries strongly suggested that K.M. would not have been able to talk, play with a balloon, run to the refrigerator, eat a meal in his highchair, or sit up and watch cartoons when he returned from Todd Martin's custody if he had suffered the abdominal injuries while in Todd's care. Dr. Hunter would not have had *as much* to testify about regarding the head injuries without Dr. Reichard's report. However, Dr. Hunter could have testified about his own

observation that it was immediately obvious that K.M. had suffered a severe head injury when brought to the emergency room on July 10.

The most important item from Dr. Reichard's report that would have been missing from Petitioner's trial if the report had been excluded sua sponte is the opinion that K.M. suffered a corpus callosum tear.

The testifying doctors would *not* have been able to use this piece of evidence to support their contention that only an intentional blow to the head would have caused such a tear, and the degree of force required to cause the tear would have resulted in the victim being rendered unconscious or nearly unconscious at the time of impact. (See State's Lodging A-4, p. 930 (Dr. Ross testimony).) Nevertheless, the omission of this evidence would not have destroyed the prosecution's case, because both the bilateral nature of the head injuries and the life-threatening abdominal injuries—together with testimony about the timing of the manifestation of those injuries estimated from the testifying doctors' past professional experience with treating similar injuries—were independent findings not premised upon Dr. Reichard's report.

In fact, the prosecutor argued in closing:

> Dr. Arden, when I reviewed his testimony, spent a lot of time talking about whether or not there was a tear in the corpus callosum..... Okay. Let's assume there wasn't. What difference does that make, you know? Didn't change what happened to [K.M.] Didn't change the fact that he went unconscious. Didn't change the fact that he died from his head injuries. So, I submit to you that's a little bit of smoke and mirrors to get  you confused.

(*Id.*, p. 1426.)

**MEMORANDUM DECISION AND ORDER - 51**

In conclusion, the trial record supports the conclusion that not objecting to the admission of Dr. Reichard's brain autopsy report was a tactic in support of the defense strategy. Turning to the question of whether extra-record evidence showed otherwise, this Court finds that the additional evidence also supports a strategic purpose.

During his deposition, defense counsel testified that the reasons he did not objection to the introduction of the autopsy report prepared by Dr. Ross (that contained the brain autopsy report prepared by Dr. Reichard) was that "[t]here wasn't anything in the autopsy report that didn't work with ... what [the] thrust of the case was going to be." (State's Lodging D-1, p. 18.) He explained that the defense theory was that "the injuries that occurred to [K.M.] were inflicted at a time when Stace [Petitioner] was not around with the child in any fashion that it could have happened." *Id.* When further questioned, he agreed that there was some evidence in the autopsy report that "undermined the thrust of [his] defense," but explained that he did not object because, in his own words,

> I had what I believed to be evidence that his findings weren't totally correct, if you will. And as such, we had – a number of doctors were relying on the autopsy report, including Reichard's report, and I felt that Dr. Arden would, in large degree, poke enough holes in that to make – I guess in a sense, hopefully make reliance on that report misplaced.

(*Id.*, p. 19.)

Defense counsel admitted during his deposition that Dr. Reichard's brain autopsy report "contain[ed] bad facts for [his] theory of the case," and that, "[f]rom a strategic point of view," it would have been better to exclude it. (*Id.*, p. 22.) Importantly, defense counsel realized it was unlikely that the prosecution would not have taken extraordinary

efforts to try to produce Dr. Reichard for trial, either via video or in person, had an objection been made. *Id*., p. 20.

Defense counsel also realized that it was very unlikely that Dr. Reichard, an experienced neuropathologist, would not have been able to support his opinion that the laceration did in fact occur as a result of blunt force trauma if confronted with Dr. Arden's opinion that Dr. Reichard had made an obvious, sloppy error in conducting the brain autopsy. Defense counsel stated during the deposition that he had to "take into consideration the possibility that Dr. Reichard could have been made a witness and come to testify and then have him and Arden sitting there at opposing positions." *Id*., p. 20. The dual tactics of (1) not revealing Dr. Arden's opinions to the prosecution in advance— which likely would have prompted the prosecution to add Dr. Reichard to its list of trial witnesses—and (2) allowing Reichard's opinion to come into evidence in a manner that precluded Dr. Reichard from rebutting Dr. Arden's criticism of his opinion, were made possible by admission of the brief report. The record is made clearer by defense counsel's deposition and hearing testimony that he chose an ambush strategy, rather than a strategy of disclosure that would have invited a battle of the experts.

Adding another live witness, Dr. Reichard, to the State's arsenal would not have been helpful to the defense. In addition, Dr. Reichard was a neuropathologist, while Dr. Arden was a nonspecialized pathologist, which could have proven to be a deciding factor on which expert the jury believed. Petitioner also speculates that some of the prosecution's expert witnesses would have testified contrarily to each other, which would have bolstered Petitioner's defense if he had called Dr. Reichard. Just as likely, however,

the prosecution would have prepared all of its witnesses thoroughly in an attempt to avoid conflicting testimony.

In light of the foregoing, the Court concludes that trial counsel considered and determined that the better path was to forego preparation of a defense expert report and battle Dr. Reichard's report at trial, rather than his in person testimony. These were decisions that were made long before the first mention of the report by the prosecution's witnesses at trial. Any jurist analyzing this claim necessarily must look at the whole defense strategy, not at the moment Dr. Reichard first became a topic of discussion at trial.

This Court agrees that Petitioner failed to make a showing of clear constitutional error. Quite the opposite is true. The trial transcript, strengthened by trial counsel's explanations during his deposition and by the evidentiary hearing transcript, shows that not objecting to admission of the brain autopsy report was part of the defense strategy. Therefore, upon de novo review, the Court finds the Idaho Court of Appeals' decision that Claim 1 did not present a true Confrontation Clause issue and, moreover, did not amount to a Due Process Clause violation, was not erroneous. This claim is subject to denial and will be dismissed with prejudice.

## CLAIM TWO

Claim Two is that trial counsel was ineffective by failing to object to the admission of Dr. Reichard's report and the surrogate testimony by the State's experts on Confrontation Clause grounds. This claim was properly presented to the Idaho Court of Appeals on post-conviction review, which rejected the claim after an evidentiary hearing.

(State's Lodgings C-3 & D-6.) The Idaho Supreme Court declined to further review the claim. (State's Lodging D-9.) Therefore, Claim 2 has been adjudicated on the merits by the state courts; accordingly, the AEDPA deferential standard of review applies.

## 1. Standard of Law

*Strickland v. Washington*, 466 U.S. 668 (1984), is recognized as clearly-established law governing Sixth Amendment claims of ineffective assistance of counsel. *Strickland* dictates that, to succeed on an ineffective assistance claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In assessing trial counsel's performance under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the "reasonableness" of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance

> requires that every effort be made to eliminate the distorting
> effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct
> from counsel's perspective at the time. Because of the
> difficulties inherent in making the evaluation, a court must
> indulge a strong presumption that counsel's conduct falls
> within the wide range of reasonable professional assistance;
> that is, the defendant must overcome the presumption that,
> under the circumstances, the challenged action might be
> considered sound trial strategy. There are countless ways to
> provide effective assistance in any given case. Even the best
> criminal defense attorneys would not defend a particular
> client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense or which evidence to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. The Ninth Circuit has provided some insight into the *Strickland* standard when evaluating an attorney's "strategy calls." Circuit cases are instructive in the Court's assessment of whether the Idaho Court of Appeals reasonably applied *Strickland*. *See Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 1999). First, tactical decisions do not constitute ineffective assistance simply because, in retrospect, better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to tactics does not render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).

In assessing prejudice under *Strickland*'s second prong, a court must find that, under the particular circumstances of the case, there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 684,

694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

A petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel claim. 466 U.S. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

The foregoing standard, giving deference to counsel's decisionmaking, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, *supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington v. Richter*, 562 U.S. 86, 112 (2011).

**2. State Court Decision**

In reviewing Petitioner's Confrontation Clause claim, the Idaho Court of Appeals

concluded:

> We agree that trial counsel's decision not to object to the evidence referencing Dr. Reichard's findings was a strategic one. As mentioned above, counsel's choice of witnesses, manner of cross-examination, and lack of objections to testimony are considered tactical or strategic decisions. This Court has long adhered to the proposition that tactical or strategic decisions of trial counsel will not be second guessed on appeal unless those decisions are based on inadequate preparation, ignorance of relevant law, or other shortcomings capable of objective evaluation. Dr. Reichard's findings are the crux of the central issues in this case—when the injuries that ultimately caused K.M.'s death occurred and whether it was likely that K.M. would have lost consciousness and/or shown severe symptoms immediately after the injuries were inflicted. To that end, trial counsel was reasonably leery of Dr. Reichard being called to testify and being a strong witness for the State. Further, Grove does not identify what trial counsel could have achieved if Dr. Reichard had been required to testify as opposed to using the defense's own expert, Dr. Arden, to "poke holes" in Dr. Reichard's findings. Grove has not demonstrated that the cross-examination of Dr. Reichard would have been a more effective strategy when, in fact, it is possible that Dr. Reichard's testimony may have undermined Dr. Arden's testimony.
>
> Grove has failed to demonstrate that trial counsel's decision was the product of inadequate preparation, ignorance of the law, or other objective shortcomings. Accordingly, we will not second-guess this decision on appeal. As a result, the district court did not err in summarily dismissing Grove's claim for ineffective assistance of counsel in not asserting Grove's state and federal constitutional rights to confrontation and in failing to make related evidentiary objections.

(State's Lodging D-6, pp. 15-16.)

**MEMORANDUM DECISION AND ORDER - 58**

### 3. Discussion

Petitioner's ineffective assistance claim presupposes that an objection to the Dr. Reichard evidence would have been sustained. However, in 2008, the trial court and counsel had only the *Crawford* decision as precedent to rely upon regarding a motion in limine or objection. *Crawford* did not address the difficult question of what limitations should be placed on experts who rely on admitted materials from out-of-court experts to formulate their own opinions. *Melendez-Diaz and Bullcoming* did not exist. *Williams*, the plurality decision issued in 2015, seven years after Petitioner's trial, shows that, even at that late date, many nuances and variations were yet unresolved.

Neither was there any on-point state law precedent that trial counsel could have cited to support his position had he made an objection. The Idaho Supreme Court decided a case similar to the facts of Petitioner's case in 2009, the year *after* Petitioner and the trial court were confronted with this issue. In *State v. Watkins*, 224 P.3d 485, 491–94 (2009), a DNA expert named Kermit Channel had performed DNA testing on the child victim's underwear and on a used condom, the results of which inculpated the defendant as the sperm depositor. However, it was Channel's colleague, Carla Finis, not Channel himself, who actually testified about Channel's report at trial. Under these circumstances, the Idaho Supreme Court explained:

> As counsel for the State acknowledged, Dr. Finis' testimony regarding Channell's notes about how he performed the DNA testing is hearsay. The contents of Channell's notes were relevant only for the purpose of proving the truth of the matter asserted therein—that Channell created reference DNA samples for Watkins and the six-year-old girl, extracted

DNA from both the inside and outside of the condom, and tested that DNA for a match with the reference samples. Dr. Finis then testified that, according to Channell's notes, Channell removed seven pairs of girls' underwear from the evidence box and found semen on one pair from which he extracted DNA that he then tested for a match.

Before Dr. Finis could testify that the DNA in the semen on the underwear matched Watkins' DNA, Watkins' counsel objected and moved "to strike the DNA evidence on the grounds I've stated." It is evident that the sole purpose of presenting evidence as to the contents of Channell's notes was to show that Channell tested a substance that he identified as semen in the manner described by Dr. Finis' to determine whether there was a DNA match. As highlighted above, counsel for the State admitted that Dr. Finis' testimony relating to the substance of written and oral communications from Channell was hearsay; that is, it was offered to demonstrate that Channell's testing was conducted in a reliable and accurate manner. Even without the State's attorney's admission, it is evident that Dr. Finis was relaying Channell's statements for the truth of their contents. If Channell's statements were not truthful, Dr. Finis' interpretation of his test results would have been without evidentiary significance. Thus, we conclude that Dr. Finis' testimony regarding Channell's testing on the underwear was hearsay.

*  *  *

Because Dr. Finis' testimony contained hearsay that does not fall within an exception to the general prohibition against admission of hearsay evidence, we conclude that the district court abused its judicial discretion when it admitted Dr. Finis' hearsay testimony. We reach this conclusion because the district court failed to act consistently with the applicable legal standards provided by the rules of evidence. Further, we conclude that the introduction of this evidence affected a substantial right of Watkins. The inadmissible hearsay presented to the jury included Dr. Finis' testimony that Watkins' semen was found on the child's panties, and that DNA from both Watkins and the child was found on a used condom. Although the child told an interviewer from CARES that Watkins had sexual intercourse with her, other evidence

> introduced during the trial indicated that she had made
> similar, unfounded allegations against her uncle, and a
> medical examination of the child's vagina and anus did not
> result in "definitive abnormal findings." We are unable to
> conclude that the jury would have returned the same verdict
> without the inadmissible hearsay from Dr. Finis. Accordingly,
> the judgment must be vacated and this matter remanded for a
> new trial.

224 P.3d at 491-94. Petitioner's counsel did *not* have the clarity of this decision when determining whether to try to exclude Dr. Reichard's written findings and conclusions. Without any of the newer state and federal precedents, it is far from clear that an objection would have been sustained.

The Court next turns to the issue of tactics and strategy. As discussed above, the trial transcript reflects a strategy centered on showing that the injuries occurred during the time period Todd Martin had custody of K.M.

True to his strategy, trial counsel elicited testimony on cross-examination that the medical experts testifying for the State were relying on Dr. Reichard's brain autopsy report. Dr. Hunter testified that he was not a pathologist, that he did not know anything about reviewing microscopic tissue samples, and that he had reviewed the autopsy report. (State's Lodging A-4, p. 878.) Dr. Ross, the general pathologist testified that he removed the brain but did no testing, tissue slides, or internal examination of the brain. (*Id.*, pp. 951-52.) Dr. Harper testified that she was not a pathologist, did not attend the autopsy, but had been provided with the general autopsy report and the brain autopsy report for her review. (*Id.*, p. 1050.)

**MEMORANDUM DECISION AND ORDER - 61**

Defense counsel called Dr. Arden to testify at the end of the case. His testimony

contained the following opinions and explanations:

- Dr. Ross's general autopsy report does not contain any indication as to when the injuries described were inflicted. (State's Lodging A-4, p. 1261; see State's Lodging A-13, Dr. Ross's autopsy report.)

- There are significant injuries to the head and the belly that are about three days old as judged by their appearances at autopsy. There are some features in some of these injuries that are a little fresher and newer than three days. And there are some injuries unrelated to the actual cause of death that are somewhat older still. (State's Lodging A-4, p. 1263.)

- Putting a time frame on when the brain injuries occurred could come only from the microscope examination of the important or relevant issues; by implication, then, Dr. Chin, Dr. Harper, Dr. Hunter, and Dr. Ross—to the extent he discussed the brain injuries—were without an adequate factual basis. For instance, Dr. Arden said that the microscopic appearances, the findings that he observed in the subdural hematoma, were really the most important aspect or foundation for that opinion. (*Id*., pp. 1267-68.)

- To make a time frame assessment that the injuries were three or more days old, Dr. Arden explained that the body has a normal sequence of events for how it responds to injuries and how it reacts to things to try to contain them and overcome them, in an effort to heal them. He discussed how the first wave of microscopic responders to a new injury is made up of white blood cells, called polymorphonuclear neutrophils, which cause inflammation to occur. Next, macrophages, which are like scavengers, come in to continue to clean up the wound. Next, fibroblasts, which are connective tissue cells containing collagen, start to rebuild the wound by creating scar tissue. (*Id*., pp. 1269-72.)

- In the microscopic slides of the subdural hematoma, Dr. Arden identified that many of the cells are macrophages. He explained that this happens a couple of days after the first wave of responders. (*Id*., p. 1275.)

- Dr. Arden concluded that there was no laceration of the corpus callosum before K.M. died. He was first skeptical because he did not think there could be a laceration to the corpus callosum that was visible only under the microscope and not visible to the naked eye. His initial reaction was confirmed when he viewed the microscopic tissue cross-sections. The corpus collosum is white matter, and the gray matter is located elsewhere, in the functioning part of the brain (the neurons). The matter on the slide made him conclude that the split in the tissue was an artifact that happened in the handling, from the cutting, trimming, and processing of the tissue for the slide making. There was no

hemorrhage in the tissue itself, no injury or death of the tissue itself, there was a lump of blood that seemed to be self-contained and did not conform to the configuration of the cleft, and there was a piece of gray matter that came from a completely different part of the brain. Arden opined that, somewhere along the process of removing the brain and making the slides, a piece of the blood clot and a piece of gray matter that does not belong there landed on a tear that was made in the tissue during the handling. "You can't get this gray matter there any other way," he said. (*Id.*, pp. 1290-91.)

- As to the belly injuries, the tissue slides show that area of injury around the pancreas (the retroperitoneum) had ranges from macrophages to the third wave of cells that occur in the chronic stage after the macrophages, and they also had signs of fibrosis, which is scarring. (*Id.*, p. 1302.)

- Because the abdomen had more time to heal to the point where it was making an actual scar, and the cells were farther down the process, in all likelihood, the injuries were significantly more than three days old. Dr. Arden opined that some of the belly injuries were a minimum of a week old. The wounds with scarring were probably several weeks old. (*Id.*, pp. 1302-03.)

- Many of the injuries showed a substantial amount of healing. Therefore, K.M. may have exhibited symptoms of immediate, severe pain when those injuries were brand new and fresh, but there is no reason to say he had to have been doubled over in belly pain the night before or the day before he died, given the fact that he obviously survived some of those injuries for a period of days, and some of them possibly a week or several weeks. (*Id.*, p. 1317.)

- It is not surprising that Dr. Chin did not see these injuries on Saturday before the child's death. It is the rule, not the exception, with child abuse impact injuries to the abdomen that very little is seen, sometimes nothing on the surface. (*Id.*, p. 1332.)

- Dr. Arden clarified that his opinion was that the injuries occurred more than 48 hours before cross-clamping. (*Id.*, p. 1342.)

Dr. Arden confidently used microscopic research evidence of the child's brain to demonstrate why the injuries likely were inflicted during Todd Martin's custody of K.M. Dr. Arden painted a picture of Dr. Reichard being careless in his review of the tissue slides, such as failing to see misplaced gray matter in the corpus callosum slide. Dr. Reichard should have realized that the slide was contaminated, rather than concluding

there was a laceration. Dr. Reichard was not at trial to rebut Dr. Arden's conclusions. Because none of the testifying doctors had reviewed the brain slides, Dr. Arden's testimony was intended to rebut and discredit all of them in one fell swoop.

Overall, the record reflects that defense counsel's strategy was the product of thought and decisionmaking, not oversight and negligence. This Court concludes that defense counsel was not deficient in deciding to challenge Dr. Reichard's conclusions via his own expert, Dr. Arden, rather than facing Dr. Reichard head-to-head.

Indeed, when the *Harrington v. Richter* layer of double-deference is applied—that even if the Idaho Court of Appeals' decision was erroneous, it should be upheld if it is not unreasonable—Petitioner's ineffective assistance of counsel claim fails. The question is not whether a better strategy or better tactics existed; it is whether the tactics and strategies chosen were reasonable. As explained above, counsel's tactical and strategic decisions were among several reasonable ways to defend Petitioner under the difficult circumstances presented by this case—particularly when faced with multiple experts and the probability that an objection would almost certainly function as an invitation for Dr. Reichard—the only neuropathologist associated with the case—to come to trial. Defense counsel put on an adequate defense under the totality of the circumstances. The Idaho Court of Appeals' decision is neither erroneous nor unreasonable. Accordingly, Claim 2, and this entire action, will be denied and dismissed with prejudice.

## ORDER

**IT IS ORDERED:**

1. The Petition for Writ of Habeas Corpus is DENIED and DISMISSED with
   prejudice.

2. The Court does not find its resolution of this habeas matter to be reasonably
   debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.
   § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a
   timely notice of appeal, the Clerk of Court shall forward a copy of the notice of
   appeal, together with this Order, to the United States Court of Appeals for the
   Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth
   Circuit by filing a request in that court.

DATED: April 28, 2020

Honorable Candy W. Dale
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 65**